UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
HARBANS GERA, ANKIT GERA, SUNITA GERA, and
AMIT GERA in his capacity as Trustee for THE GERA
2021 FAMILY TRUST, PERFUME NETWORK INC. and       Docket No.
HAAS NY, LLC

                              Plaintiffs,              **COMPLAINT**

         -against-                                    **JURY TRIAL DEMANDED**

JOLLY LUTHRA, NEW YORK LIFE INSURANCE AND
ANNUITY CORPORATION, NYLIFE SECURITIES
LLC, TELEWORLD NY LLC, JASMINE NARANG,
JAIDEEP NARANG, and LUTHRA FINANCIAL LLC.

                              Defendants.
---------------------------------------------------------------------x

Plaintiffs Harbans Gera, Ankit Gera, Sunita Gera and Amit Gera as Trustee for The Gera

2021 Family Trust ("Geras"), Perfume Network Inc. ("Perfume Network") and HAAS NY, LLC

("HAAS"), as and for their complaint against defendants Jolly Luthra ("Luthra"), New York Life

Insurance and Annuity Corporation and NYLife Securities LLC (collectively "NY Life"),

Teleworld NY LLC, Jasmine Narang and Jaideep Narang ("the Narangs"), and Luthra Financial

LLC ("Luthra Financial"), allege, upon information and belief:

## NATURE OF THE ACTION

1.      For the last two decades, Inderjeet Singh ("Singh")[1] and Luthra, deceived,

manipulated and defrauded the Geras as NY Life and Luthra Financial representatives by

recommending and selling unsuitable and inappropriate replacement life insurance policies and an

annuity.

---
[1] Singh filed for bankruptcy on February 24, 2023 and therefore is not a named defendant in this action.

2.      Harbans and Sunita Gera moved to the United States from India in the 1980s as unsophisticated immigrants with no financial sophistication.

3.      After working endless hours selling perfume on New York City streets, they saved every penny, had their children, Ankit and Amit, and bought their first home.

4.      They began to participate in Indian community events on Long Island, where they were befriended by Singh.

5.      After acquiring the Geras' trust, Singh schemed with Luthra to recommend and sell the Geras inappropriate and unsuitable replacement life insurance policies and an annuity.

6.      Singh even promised to pay the Geras cash kickbacks if they purchased the policies he recommended.

7.      But Singh did not stop there.  He convinced the Geras to lend him $1.6 million.  He then failed to pay back a penny, despite multiple demands and knowing that Harbans was and is suffering from cancer.

8.      Singh used these funds to prop up Teleworld, his shell company, pay his wife and children for no show jobs, buy his son interests in cell phone companies, purchase and renovate a luxury apartment in Queens, and otherwise used Teleworld as his personal piggy bank to defraud creditors.

9.      NY Life and Luthra Financial were negligent in failing to supervise Singh and Luthra and allowed them to violate their policies and procedures, federal securities laws, New York Insurance Law, 11 NYCRR 224.4(f) and the New York Department of Financial Services' February 17, 2015 Regulatory Guidance on Replacement Life Insurance by failing to establish, implement and maintain a supervision system reasonably designed to achieve compliance with New York's insurance regulations, including a system to ensure that Singh and NY Life and Luthra

720397.002

and Luthra Financial properly documented any recommendations and a system to ensure the education and training of its insurance agents and brokers about the requirements of New York's replacement regulation.

## JURISDICTION AND VENUE

10.     This is a civil action arising under Section 10(b) of the Exchange Act (15 U.S.C. 78j(b)) and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R §240.10b-5).

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this district under Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the fraud or the effects of the fraud occurred in this district.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

14.     The Geras reside in Suffolk County, New York.

15.     Perfume Network is a corporation formed under the laws of New York, and wholly owned by the Geras.

16.      HAAS is a limited liability company formed under the laws of New York.

17.     Luthra resides in Franklin Township, New Jersey.

720397.002

18.     New York Life Insurance and Annuity Corporation is a Delaware corporation with a principal place of business at 51 Madison Avenue, New York, New York and a statutory home office in Wilmington, Delaware.

19.     NYLife Securities LLC is a limited liability company formed under the laws of Delaware.

20.     Teleworld NY LLC is a limited liability company formed under the laws of New York.

21.     Jasmine Narang and Jaideep Narang are residents of New York.

22.     Singh has complete and unfettered control over Teleworld, disregards Teleworld's corporate form, intermingles his personal assets with those of Teleworld's, undercapitalizes Teleworld, fails to maintain distinct books and records for Teleworld, fails to make any distinctions between Teleworld's computer systems and his personal computer systems, and has used Teleworld to perpetrate fraud and other wrongs on the Geras by using Teleworld as a personal slush fund, a vehicle to defraud creditors and effect fraudulent transfers.

## FACTUAL BACKGROUND

23.     The Geras are self-made, first generation immigrants, who immigrated to the United States from India with virtually no assets and no financial sophistication.

24.     They began working by selling perfume and other fragrances on New York City streets.

25.     The Geras met Singh within the Indian community and would often see him at community events. Singh held himself out to be a sophisticated financial planner and methodically earned their trust. He falsely claimed that he was the number five insurance agent in the country.

26.     Singh introduced the Geras to Luthra, who also methodically gained their trust.

720397.002

27.     Singh and Luthra recommended and sold to the Geras various unsuitable investment products.

28.     The recommendations were unsuitable and not in the Geras' best interests, because, among other things: (a) the premiums they were paying on policies Singh and/ or Luthra told them to surrender were less than the premiums on policies he recommended; (b) the policies Singh or Luthra recommend had higher surrender charges than the policies Singh or Luthra recommended replacing; (c) the policies or annuity Singh or Luthra recommended were not suitable for the Geras because the Geras had already acquired more than enough assets to live the remainder of their lives in their current lifestyle.

## AS AND FOR A FIRST CLAIM (SECURITIES FRAUD)

29.     The plaintiffs repeat and reallege the previous allegations as if fully set forth herein.

30.      On or about January 13, 2021, Luthra recommended to Amit Gera that the Geras transfer their investments at Merril Lynch, Pierce, Fenner & Smith Inc. ("Merrill") to the care and management of Singh and Luthra through NYLife and Luthra Financial.

31.     On October 11, 2022, Singh and Luthra met with Amit Gera in the Perfume Network office and recommended investing the Geras' assets at Merrill in a NYLife variable annuity.

32.     Luthra failed to disclose that these transactions would cause the Geras in to incur fees, penalties and taxes.

33.     Luthra falsely represented to Amit that investing the funds in annuities was "better" but failed to provide any explanation for his conclusion.

34.     Luthra knew, but failed to disclose, that the annuities he recommended were actually more expensive in management fees and unsuitable for the Geras.

720397.002

35.     Luthra knew, but intentionally failed to disclose, that the annuities were unsuitable because selling them to the Geras would render him a large commission of 5-7%.

36.     The base reason for an annuity is to generate lifetime income, and shift the risk of outliving one's assets to the insurer.

37.     Luthra knew that the Geras did not require an annuity because their net worth was approximately $40 million, Harbans and Sunita are in their sixties, and Amit and Ankit have a high risk tolerance.

38.     Harbans and Sunita Gera incurred more than $80,000 in taxable gains because of Luthra's deception.

39.     Ankit Gera incurred a loss of more than $50,000 due to Luthra's deception.

40.     Amit Gera incurred almost $40,000 in taxable gains due to Luthra's deception.

41.     Luthra made these recommendations despite knowing the adverse tax implications of the liquidation, without considering the suitability given the Geras' financial condition, risk tolerance or time horizons, despite knowing his statements were inaccurate and misleading, and despite failing to obtain and check information he had a duty to monitor.

42.     The Geras were financially damaged by the liquidation of the Merril Lynch positions because the Geras would have earned more money if the positions had not been liquidated, they were required to pay taxes on the profits of the liquidation, and were required to pay fees associated with the liquidation.

43.     The Geras would not have liquidated the positions at Merril Lynch but for Luthra's unsuitable recommendation and deliberate misrepresentations.

44.     Luthra's deliberate misrepresentations significantly altered the mix of information available to the Geras.

45.     Luthra Financial and NYLife directly or indirectly controlled Luthra and recklessly failed to monitor him and ensure that he complied with his fiduciary duties in recommending transactions to the Geras.

### AS AND FOR A SECOND CLAIM (VIOLATION OF INSURANCE LAW)

46.     The plaintiffs repeat and reallege the previous allegations as if fully set forth herein.

47.     Singh and Luthra's conduct violated Insurance Law Sections 2123(a)(3) and 4226(a)(6); 11 NYCRR 224 (Regulation 187) and 11 NYCRR 51.5 (Regulation 60); NY Circular Letter No. 2016-7 (2016 WL 7165851); and New York's Debtor Creditor Laws.

48.     The purpose of Regulation 60 is:

> To protect the interest of the life insurance public establishing minimum standards of conduct to be observed in the replacement of life insurance policies, by making available full and clear information on which an applicant for life insurance can make a decision in his own best interest, by reducing the opportunity for misrepresentation and incomplete comparison in replacement situations, and by precluding unfair methods of competition and unfair practices.

11 NYCRR 51.1(b); *Farley v. Metropolitan Life Ins. Co*, 127 A.D.2d 99, 103, 513 N.Y.S.2d 712, 714 (2d Dep't 1987).

49.     Regulation 187 was first promulgated as an emergency regulation in 2010, and as a final regulation in 2013.

50.     The regulation was intended to ensure that "the insurance needs and financial objectives of consumers" were addressed when entering into annuity contracts, and to update New York's regulations to mirror national model rules (*see* former Department of Financial Services Regulations [11 NYCRR] § 224.0).

51.     The regulation originally required that insurance producers—i.e., agents and brokers—and insurers have "reasonable grounds for believing that [a] recommendation is suitable

for the consumer on the basis of the facts disclosed by the consumer as to the consumer's investments and other insurance policies or contracts and as to the consumer's financial situation and needs, including the consumer's suitability information" (*id.* § 224.4[a]).

52. The regulation also required a recommender to have a reasonable basis to believe that the consumer was informed of the features of the contract, that the consumer would benefit from the contract, and that the contract was suitable to the consumer, considering the consumer's "suitability information" (*id.* § 224.4[a][1]-[4]).

53. In the original version, "recommendation" was defined as "advice provided by an insurance producer, or an insurer where no insurance producer is involved, to a consumer that results in a purchase or replacement of an annuity contract in accordance with that advice" (*id.* § 224.3[c]). "Suitability information" was defined to include several considerations including age, income, financial needs and objectives, and risk tolerance (*see id.* § 224.3[e]).

54. In 2018, following two rounds of public comment and a revised proposal and regulatory impact statement, DFS amended the regulation.

55. The amendment addressed concerns that the purchase of annuities and life insurance had become increasingly complex with more products available to purchase.

56. The Department of Financial Services ("DFS") reasoned that consumers, finding themselves more reliant on professional advice in order to understand the options available and to make purchasing decisions, had become more susceptible to producers and insurers recommending transactions that prioritized their own compensation over the consumer's best interest (*see* Revised Regulatory Impact Statement for the First Amendment to 11 NYCRR 224 [Insurance Regulation 187] 2–4 [2018] [Revised Impact Statement]).

57.    The amendment accordingly extended the scope of the regulation to cover both annuity and life insurance contracts, and created a new standard applicable when producers and insurers make "recommendations" to consumers.

58.    The amended regulation, which applies to both "sales transactions" and "in-force transactions" (*see* 11 NYCRR 224.3[i]-[k]), requires that producers, or insurers when no producer is involved, act in the "best interest of the consumer" when making a "recommendation" (*id.* §§ 224.4, 224.5).

59.    A similar requirement, derived from the National Association of Insurance Commissioners' Model Regulation 275, applies in dozens of other states.

60.    The amended regulation explains in detail what a producer or insurer must do to discharge this duty when making a recommendation with respect to sales transactions.

61.    The producer or insurer must, among other things: make "reasonable efforts" to obtain the consumer's "suitability information"; base any recommendation "on an evaluation of the relevant suitability information" that "reflects the care, skill, prudence, and diligence that a prudent person acting in a like capacity and familiar with such matters would use under the circumstances then prevailing"; "[o]nly [consider] the interests of the consumer ... in making the recommendation" and not be influenced by compensation or other incentives; recommend only "suitable" transactions; and have a "reasonable basis" to believe that the consumer has been reasonably informed of the features of the policy, the potential consequences of the transactions, both favorable and unfavorable, and that the consumer would benefit from certain features of the policy and the particular policy as a whole (11 NYCRR 224.4[b]).

62.    DFS noted that, in implementing the original version of the regulation, the lack of a definition for the term "suitable" had been a "significant shortcoming," given that DFS had

"encountered uncertainty and disagreement in the industry about what it means to be suitable" (Revised Impact Statement at 5).

63.     DFS therefore incorporated a new definition of the term into the amended regulation: "in furtherance of a consumer's needs and objectives under the circumstances then prevailing, based upon the suitability information provided by the consumer and all products, services, and transactions available to the producer" (11 NYCRR 224.3[h]).

64.     Singh and Luthra's misconduct included, among other things:

- recommending and selling unsuitable insurance policies and an annuity to replace prior, suitable investment products;

- failing to consider age, annual income, financial situation and needs, financial experience, financial objectives, intended use of the annuity, financial time horizon, existing assets, liquidity needs, liquid net worth, risk tolerance, income payout options and tax status;

- misrepresenting the comparative benefits and disadvantages of proposed policies;

- failing to obtain or prepare a Comparison-Disclosure Statement;

- failing to obtain Definitions of Replacements;

- failing to submit signed and complete Definitions of Replacement;

- preparing forms after policies were issued even though New York law required them to prepare the forms before the policies were issued;

- using personal email accounts rather than company email accounts to evade detection of wrongful conduct;

- failing to obtain with each application a list of all existing life insurance policies or annuity contracts proposed to be replaced;

- failing to request the information necessary to complete required disclosure statements;

- failing to obtain good faith approximations;

- failing to provide the Geras with a copy of the required notices for their records;

720397.002

- failing to specify the primary reasons for recommending the new policies or annuity and why the existing policy or annuity could not meet the Geras' objectives;

- failing to ask pertinent questions relating to the probability of replacement;

- failing to obtain and provide other documentation required by Regulation 60; and

- failing to have a reasonable basis to believe that: (1) the Geras were reasonably informed of various features of the annuity contract, such as the potential surrender period and surrender charge, availability of cash value, potential tax implications if the Geras sold, surrendered or annuitized the annuity contract, death benefit, mortality and expense fees, investment advisory fees, potential charges for and features of riders, limitations on interest returns, guaranteed interest rates, insurance and investment components, and market risk; (2) the Geras would benefit from certain features of the annuity contract, such as tax-deferred growth, annuitization or death or living benefit; (3) the particular annuity contract as a whole, the underlying subaccounts to which funds are allocated at the time of purchase or replacement of the annuity contract, and riders and similar product enhancements, if any, were suitable and that the transaction as a whole was suitable for the Geras based on the Geras' suitability information (as defined in 11 NYCRR 224.3(e)); and (4) the replacement is suitable, including taking into consideration whether:

  > (i) the Geras would incur a surrender charge, be subject to the commencement of a new surrender period, lose existing benefits (such as death, living or other contractual benefits), be subject to tax implications if they surrender or borrow from the annuity contract, or be subject to increased fees, investment advisory fees or charges for riders and similar product enhancements; (ii) the Geras would benefit from annuity contract enhancements and improvements; and (iii) the Geras had another annuity replacement, in particular, a replacement within the preceding 36 months.

65.    Singh and Luthra's misconduct caused the Geras damages in an amount to be determined at trial but no less than $15 million.

66.    The wrongful conduct was intentional, egregious and in bad faith and NY Life and Luthra Financial's conduct was egregious and in willful disregard to their obligations, warranting an award of punitive damages to deter future similar conduct.

720397.002

## AS AND FOR A THIRD CLAIM (BREACH OF FIDUCIARY DUTY)

67.    The plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

68.    Singh and Luthra engaged in a course of conduct with plaintiffs so that they created a heightened duty of trust and a special relationship on which the Geras justifiably relied.

69.    That heightened and special relationship created a heightened duty of care that Singh and Luthra owed to the Geras.

70.    Singh and Luthra breached that duty by intentionally deceiving the Geras, misleading them and engaging in the conduct described above.

71.    Singh and Luthra's wrongful conduct was egregious, intentionally wrong and sufficiently wanton to warrant an award of punitive damages.

## AS AND FOR A FOURTH CLAIM (FAILURE TO SUPERVISE)

72.    The plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

73.    NY Life and Luthra Financial failed and breached their duties to supervise and train Singh and Luthra as required by New York Law.

74.    Because of the foregoing, the Geras suffered damages in an amount to be determined at trial.

## AS AND FOR A FIFTH CLAIM (BREACH OF CONTRACT)

75.    The plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

76.    Perfume Network and HAAS entered into agreements with Singh to lend him more than $100,000.

720397.002

77.     Perfume Network and HAAS fully performed under the terms of the agreements.

78.     Singh breached the agreements by failing and refusing to pay back any of the money, despite repeated demands.

79.     Based on the foregoing, Perfume Network and Singh have been damaged in an amount to be determined at trial.

## AS AND FOR A SIXTH CLAIM (UNJUST ENRICHMENT)

60.     The plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if   fully set forth herein.

61.     Perfume Network and HAAS provided Singh with more than $100,000.

62.     Singh has retained these funds for his own personal benefit and has been unjustly enriched.

63.     Equity and good conscience require that Singh return the funds to Perfume Network and HAAS.

64.     Based on the foregoing, Perfume Network and Singh have been damaged in an amount to be determined at trial.

## AS AND FOR A SEVENTH, EIGHTH AND NINTH CLAIM (FRAUDLENT CONVEYANCE UNDER DEBTOR  CREDITOR LAW SECTIONS 273, 274, 275)

65.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

66.     Singh rendered himself judgment proof by funneling his assets through Teleworld and fraudulently transferring assets to his family and the Narangs, in bad faith and for no consideration, in violation of New York's Debtor and Creditor law.

67.     Neither Singh nor Teleworld received fair consideration when Singh transferred his and Teleworld's assets to Teleworld or the Narangs.

13

68.     When Singh transferred his or Teleworld's assets to the Narangs, Singh and Teleworld were either insolvent, or because of the transfers, became insolvent.

69.     When Singh transferred his or Teleworld's assets, Singh or Teleworld were engaged in a business transaction for which the property remaining in the hands of Singh or Teleworld was an unreasonably small amount of capital.

70.     When Singh transferred his or Teleworld's assets, Singh and Teleworld were intending to incur, or believed that they would incur, debts beyond their ability to pay them as they mature.

71.     The transfers of assets of Teleworld and Singh to the Narangs were fraudulent conveyances in violation of New York Debtor Creditor Law Sections 273, 274, and 275.

72.     As a direct result of the foregoing, the plaintiffs have been damaged in an amount to be determined at trial, plus attorneys' fees.

### AS AND FOR A TENTH CLAIM (FRAUDULENT CONVENYANCE UNDER SECTION 276 OF THE DEBTOR AND CREDITOR LAW)

73.     Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

74.     Singh caused all the assets of himself or Teleworld to transfer to the Narangs with actual intent to hinder, delay, or defraud the plaintiffs, creditors to Singh, when the transfers occurred.

75.     The transfers were fraudulent conveyances in violation of Debtor Creditor Law 276.

76.     As a result of the foregoing, the plaintiffs have been damaged in an amount to be determined at trial, plus attorneys' fees.

720397.002

**WHEREFORE,** the plaintiffs demand judgment on their complaint against defendants in an amount to be determined at trial, plus reasonable attorneys' fees, punitive damages, costs and disbursements and such other and further relief as the Court deems just and proper.

Dated: New York, New York
March 20, 2023

Yours, etc.,

**Bronster, LLP**

By:        s/ Andrew Kazin
Andrew Kazin
*Attorneys for Plaintiffs*
156 West 56th Street – Suite 703
New York, New York 10019
212-558-9300

TO:

JOLLY LUTHRA
379 Thornall Street 8th Floor
Edison, NJ 08837

NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION
51 Madison Avenue
New York, New York 10010

NYLIFE SECURITIES LLC
51 Madison Avenue
New York, New York 10010

TELEWORLD NY LLC
76 North Broadway Suite 2006A
Hicksville, NY 11801

JASMINE NARANG
217 51st Avenue 416
Long Island City, NY 11101

720397.002

JAIDEEP NARANG
217 51st Avenue 416
Long Island City, NY 11101


LUTHRA FINANCIAL LLC
379 Thornall Street 8th Floor
Edison, NJ 08837

720397.002